CMI, INC., Plaintiff,

v.

INTOXIMETERS, INC.,
et al., Defendants.

Civ. A. No. C93–0265–L(H).

United States District Court,
W.D. Kentucky,
at Louisville.

Oct. 28, 1994.

J. Bruce Miller, Anthony L. Schnell, Louisville, KY, for plaintiff.

Charles J. Cronan, IV, Stites & Harbison, Louisville, KY, for defendants.

Wilbur L. Tomlinson, Armstrong, Teasdale, Schlafly & Davis, St. Louis, MO, for Intoximeters, Inc.

Patrick W. Michael, Kenneth L. Anderson, Woodward Hobson & Fulton, Louisville, KY, for National Patent Analytical Systems, Inc.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This is a declaratory judgment action in which CMI seeks a declaration by this Court that it does not infringe Intoximeters's patent (United States Patent No. 4,495,418) and that the patent is invalid.[1] Plaintiff determined to do so due to the unusual circumstances of controversy between these two leading makers of breathalyzers. As is often true in these cases, the Court is confronted with complicated facts, sometimes uncertain science and the usual thicket of patent legal issues.

On CMI's motion for partial summary judgment, the Court holds that CMI's Intoxilyzer 5000 does not infringe; that an actual controversy exists; and that the patent is enforceable. At the conclusion of the trial, the Court concludes that Intoximeters did not engage in inequitable conduct before the Patent and Trademark Office. The Court will reserve a ruling about whether Intoximeters misused its patent and whether this is an "exceptional" case, which would warrant an award of attorney fees, until the conclusion of the second phase of this trial, which will primarily concern CMI's claims of unfair competition.

### I.

#### The 418 Patent

Before considering any patent and its validity or infringement, it is essential to describe it properly. In 1983, the Patent and Trademark Office issued to Intoximeters the 418 patent for a method of standardizing or calibrating breath alcohol by passing a dry gas carrier sample containing a known amount of alcohol over an IR (infrared) cell that is non-adsorbent as to alcohol. The inventor claimed difficulty calibrating and

---

1. The issues related to patent validity were submitted to the jury which found that CMI failed to prove by clear and convincing evidence that the patent is invalid. After an eight-day trial, the jury found specifically that the patent was valid because Plaintiff did not show by clear and convincing evidence that the patent: (1) was indefinite, (2) failed to disclose its enablement, (3) failed to disclose its best mode or (4) was obvious.

standardizing instruments using a dry gas carrier combined with "conventional" IR cells that were "usually anodized aluminum, with a coating of aluminum oxide on them, or occasionally steel on which rust forms." The inventor, Donald Hutson, stated that, "these metal oxides characteristically adsorb water and alcohol [and when using] a dry gas carrier ... the alcohol itself is adsorbed, leading to erratic results."[2] Mr. Hutson solved this problem by the "discovery" that nickel-plated aluminum is "non-adsorbent" as to alcohol and would, therefore, not produce erratic results. In short, the novelty of the patented method is the use of dry gas with a non-adsorbent IR cell, e.g., a nickel-plated or stainless steel IR cell.

For purpose of comparison, CMI's Intoxilyzer 5000 uses a dry gas carrier with an extruded aluminum IR cell.[3] Extruded aluminum has a naturally-formed coating of aluminum oxides. It is distinguishable from anodized aluminum, expressly mentioned in the 418 patent, in that anodization, an artificial means of applying an oxide coating, may create, depending on the degree of application, a thicker layer of oxides—the more oxides, the more adsorbent is the cell. The patent thus implies, and both parties agree, that extruded aluminum with its coating of oxides adsorbs alcohol; the point at which the parties diverge is the degree of that adsorption and whether that produces erratic results.

CMI takes the position that although extruded aluminum adsorbs alcohol, the adsorbency is so slight that it is of little or no consequence.[4] As CMI's lot would have it, this is how Intoximeters would define the term "non-adsorbent." Intoximeters asserts that "not adsorbent" does not mean the complete absence of adsorbency, since all metals literally adsorb, but is best defined more generally as lacking the characteristic of adsorbing to a significant degree (i.e., by producing erratic results) and lacking the characteristic of adsorbing more alcohol than nickel-plated aluminum or stainless steel.

This interpretation, however, may be unimportant since the patent implies, and since Intoximeters has repeatedly asserted in this litigation, that extruded aluminum is significantly more adsorbent than nickel-plated aluminum. Mr. Hutson suggested that the relative adsorbent qualities of these metals perhaps might be due to the different degrees to which each metal corrodes.[5] This quality of adsorbency, Mr. Hutson said, caused erratic results. In sum, Intoximeters' position is that if the Intoxilyzer 5000 works, then it must infringe; but if it does not work, it does not infringe. For the reasons set forth herein, the Court finds this position to be absolutely untenable.

## II.

### Infringement

Before trial, CMI moved for partial summary judgment on the issue of non-infringement.[6] Summary judgment is appropriate in a patent case where, construing the evidence and all reasonable inferences in a light most favorable to the non-moving party, no genuine issue of material fact exists and the mov-

**2.** Erratic results are caused by the alcohol molecules being adsorbed by, or adhering to, the walls of the metal cell. If the metal is too adsorbent, the cell cannot be cleared of the alcohol accumulated in a prior test. Thus, subsequent test results may be affected.

**3.** The term "Intoxilyzer 5000" encompasses a range of CMI instruments. Of the 24 states using the Intoxilyzer 5000, only Oregon and Wisconsin use machines with aluminum cells and a dry gas carrier. In the other states, CMI used a wet bath solution for calibration. The bidding war in Oregon between CMI and Intoximeters, however, is in part the basis for this lawsuit.

**4.** CMI's internal computer program recalculates the "zero" level after each sample reading and after each air blank has purged the system. If the new reading is within the accepted tolerance, then the machine continues to operate. The "actual" new reading may vary after each air blank due to variations in the electronics. If the new reading is outside the accepted tolerance, then an "ambient fail" is recorded. By this method, CMI asserts that extruded aluminum does not adsorb alcohol to a degree sufficient to cause erratic or incorrect results.

**5.** Corrosion is the formation of metal oxides on the surface area of metal.

**6.** The Court granted the summary judgment in advance of trial, but now puts its reasons in writing having heard all the evidence.

ant is entitled to judgment as a matter of law. *See Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed.Cir.1990) (citations omitted).

■ Under any set of facts imagined, the Intoxilyzer 5000 does not infringe the 418 patent. If it is true that extruded aluminum is significantly more adsorbent than nickel-plated aluminum, then the Intoxilyzer 5000 concededly does not infringe the 418 patent under a literal or substantially equivalent analysis of infringement. *See id.* at 796–798 (discussing literal infringement and what is required for a finding of infringement under the "doctrine of equivalents").[7]

■ On the other hand, if the alcohol adsorbency of extruded aluminum is substantially the same as nickel-plated aluminum, then prosecution history estoppel dictates that Intoximeters cannot now exclude CMI from using extruded aluminum as part of the method for dry gas calibration or standardization.[8] Prosecution history estoppel prevents a patentee from obtaining, through the doctrine of equivalents, "coverage of a subject matter that was relinquished during prosecution to procure issuance of the patent." *Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948, 951–52 (Fed.Cir.1993) (*citing Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed.Cir.1985)). "The legal standard" for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the pat-

ent. *Id.* at 952. *Zenith Labs v. Bristol Myers Squibb*, 19 F.3d 1418, 1424 (Fed.Cir. 1994).

■ Although a patentee can be his own lexicographer, the words of a claim "will be given their ordinary meaning, unless it appears that the inventor used them differently." *Hoganas*, 9 F.3d at 951 (citation omitted). Here, the ordinary meaning of the term "non-adsorbent" is unworkable, in light of the aim of the patent and the fact that all metals are, at least to some degree, adsorbent. The Court accepts Defendant's definition of the term.

The premise of the patent includes the inventor's assertion that "anodized aluminum, with a coating of aluminum oxide ... adsorb[s] alcohol." In the Description of the Preferred Embodiment, the patent states "[i]n the preferred embodiment of this invention, the interior surfaces of the IR cell that are to be exposed to breath samples ... are plated with nickel ... [t]he exposed walls can alternatively be made of stainless steel, or can be plated with or formed of other metals, such, for example, as gold or chromium, that are non-adsorptive of alcohol." Although the patent does not expressly mention extruded aluminum, the patent impliedly disclaims its use since extruded aluminum has a "coating of aluminum oxide," although to a lesser degree than does the disfavored anodized aluminum, and is significantly different than the metals listed in the Description. Unlike aluminum,[9] which readily forms a layer of aluminum oxide on its surface area, the metals mentioned in the preferred embodiment section do not readily corrode, and presum-

---

**7.** This trial did not contest the issue of whether the Intoxilyzer 5000 produces accurate results. That is for the second phase. Prior to this trial, however, the Court asked the parties to present evidence about the relative adsorptive qualities of nickel-plated aluminum and extruded aluminum because it might be relevant to the patent validity issue and also to the issue of infringement. Prior to trial, the Court concluded that whatever proof about adsorption might be presented during the first phase of this trial, it would not alter the Court's opinion about infringement. Nevertheless, the parties each presented evidence. Intoximeters could produce no credible evidence that its nickel-plated aluminum cell was less adsorptive to alcohol than an extruded aluminum cell. On the other hand, CMI produced an impressive array of tests, virtually unrebutted by any reliable

or properly conducted scientific tests by Intoximeters, which demonstrate that the adsorptive qualities of extruded aluminum as used in the Intoxilyzer 5000 do not produce inconsistent results.

**8.** CMI argues that the 5000 does not infringe because it does not use the dry gas for purposes of calibration and standardizing, but rather only for "checking." CMI asserts that calibrating is performed by another process. This argument may have validity, but the Court will not reach its conclusion on that basis.

**9.** Anodized aluminum, the type of metal used in the cells studied by the inventor, has an additional layer of oxides added to it.

ably are, for that reason, less adsorbent as to alcohol in a dry gas carrier. Keeping in mind that it is improper for a court to add extraneous limitations to a claim that are wholly apart from any need to interpret what a patentee meant by particular words or phrases, *id.* at 950 (citation omitted), the Court believes that a competitor reasonably would have concluded that the inventor would not have used as examples of non-adsorbent metals gold, chromium, and stainless steel, if the term "non-adsorbent" were to encompass extruded aluminum as well.

Moreover, during a bidding contest for the Oregon purchase of breath analyzers, Intoximeters represented by letter to CMI that the use of bare or untreated aluminum does not infringe the 418 patent. The inventor believed that extruded aluminum was too adsorbent to produce accurate results. If the inventor was incorrect about that, and it appears that he was, then he certainly cannot now exclude others from using that method about which he was mistaken. The Court concludes that Intoximeters should not be able to obtain, through litigation, coverage of a subject matter (i.e. extruded aluminum IR cells) that a competitor reasonably could conclude that it gave up to procure issuance of its patent. *See Zenith,* 19 F.3d at 1424.

### III.

### *Actual Controversy*

■ Having concluded that, as a matter of law, the Intoxilyzer 5000 does not infringe the 418 patent, the Court must determine whether there is an actual continued controversy on the issue of the validity or unenforceability of the patent. *Cardinal Chemical Co. v. Morton Int'l Inc.,* —— U.S. ——, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993). Intoximeters argued that there was no need to submit the validity issue to the jury since once it is determined that there is no infringement, CMI's legal rights are no longer implicated under the patent. Absent an actual continued controversy, the Court lacks subject matter jurisdiction.

In this case, the ruling of non-infringement did not render moot the patent validity issue, given Intoximeters's claims and use of its patent in the marketplace. Intoximeters continues to take the position that the patented method is superior to the Intoxilyzer 5000 and, more significantly, that CMI's use of extruded aluminum with dry gas produces erratic results. As long as Intoximeters uses the 418 patent as presumptive proof of these claims, the validity or enforceability of the patent is an issue in actual controversy.

### IV.

### *Conduct Before the Patent and Trademark Office*

■ An otherwise valid patent is unenforceable if obtained by inequitable conduct. Inequitable conduct requires proof by clear and convincing evidence (1) that an omitted reference or false information was material in deciding whether to allow the application to issue as a patent and (2) of an intent to deceive. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553 (Fed.Cir.1984). Information is material if there is a substantial likelihood that a reasonable patent examiner would have considered the omitted reference or the false information important in deciding whether to allow the application to issue as a patent. *Id.* Intent to deceive·may be established by a showing of gross negligence, namely reckless disregard of the duty of candor. Simple negligence or an honest mistake, however, is insufficient. *Id.*

■ Among other things, this litigation has brought to light that the inventor did not know with a reasonable degree of scientific certainty, whether anodized aluminum when used with a dry gas carrier produces erratic results, since it is clear that in many machines the perceived cause of erratic results—"anodized aluminum with a coating of aluminum oxide"—was in fact acid-etched aluminum, a highly adsorptive metal. The question is whether this mistake of fact was material to the patent examiner's decision to issue the patent. The Court believes that a reasonable patent examiner would have questioned whether all prior art or conventional IR cells were adsorbent as to alcohol had there been disclosure of the acid-etching.

It is important to compare the problem as described in the 418 patent with those actual

experiences and observations of Mr. Hutson and Mr. Forrester prior to the patent application. The inventor testified that the dry gas method of calibration (as identified in the 551 patent) did not work well with anodized aluminum and he identified the non-adsorbent qualities of nickel-plated aluminum, which achieved accurate results from dry gas calibration of breath analyzers, as a novelty.

In this case, the tests and studies which led to the discovery can best be described as anecdotal. The inventor and his partners made no attempt to account for variables, to establish a scientific protocol or to record the results. Even this could be permissible notwithstanding the fact that the inventor misstated some of the basic premises and took absolutely no reasonable care to determine the true nature of his problem. For example, the patent stated that the use of a wet bath calibration with an anodized aluminum cell led to reproducible, i.e. reliable, results. However, Mr. Hutson asserted that one of the circumstances leading to his discovery was the inaccurate results from the machines used in Tennessee, machines that functioned entirely with the wet bath carrier.

■ The high standard of proof which requires a showing of fraud or gross negligence by clear and convincing evidence, makes this a difficult decision. The law does not impose an affirmative duty to discover facts that might be relevant to a patent examiner. Rather, inventors are required to disclose all *known* relevant facts. *See J.P. Stevens*, 747 F.2d 1553. Both Mr. Hutson and Mr. Forrester seemed to be honest persons trying to tell the truth as best they remember it. Though the truth which they remember is hardly compelling, the Court cannot conclude that it amounts to fraud. Though a retrospective look reveals other readily available solutions to the problem of adsorption by IR cells, one cannot say that it was *gross* negligence to overlook them. For this reason, the Court cannot conclude that

Intoximeters engaged in inequitable conduct before the Patent and Trademark Office.

## V.

### *Misuse of the Patent*

■ Although patent misuse is an affirmative defense that *shall* be pleaded, 35 U.S.C. § 282(4), the question of patent misuse is also properly before the Court. Once proof of patent misuse is accepted by the Court, failure to have it pleaded does not preclude consideration of a defense of misuse. *Holley v. Outboard Marine Corp.*, 241 F.Supp. 657 (D.C.Ill.1964), *aff'd* 345 F.2d 351.

■ Courts will not enforce a patent if it has been used to improperly extend its scope with an anti-competitive effect. *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995 (Fed.Cir.1986). A misused patent is unenforceable until the improper practices have stopped and the effects of the misuse have dissipated. *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 371 (6th Cir.1977); *United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 465, 77 S.Ct. 490, 494, 1 L.Ed.2d 465 (1957) (noting that courts "will not aid a patent owner who has misused his patents ... until the effects of such misuse have been dissipated, or 'purged' ").

Defendant made claims of patent infringement and patent scope which were outrageous and insupportable. Defendant made these claims without investigation or reasonable belief as to their truth. Among other things, Defendant made claims about CMI's use of nickel in the Intoxilyzer 5000, which Defendant did not fairly investigate, and which it could never substantiate. It made claims about the scope of its patent which were unfair and insupportable—that its patent included methods which the inventor had specifically or impliedly disclaimed. Finally, it made claims, which are not supported by any evidence at this time,[10] about the adsor-

10. The evidence at trial convincingly demonstrated that the alcohol adsorbent qualities of extruded aluminum in the Intoxilyzer 5000 are no different than those of the nickel-plated aluminum cells identified in the 418 patent. Defendant may correctly say that Plaintiff never dem-

onstrated that extruded aluminum will not corrode. Defendant never adequately debunked this theory, however. Defendant assumed, apparently without scientifically adequate verification or testing, that any aluminum based IR cell could not produce accurate results for calibration of

bent qualities of extruded aluminum and, by direct implication, the veracity of the Intoxilyzer 5000 results. The impact of this conduct was highly anti-competitive.

The Court concludes, therefore, that there *appears* to be substantial evidence that Intoximeters misused its patent. Since the evidence required to *prove* misuse is likely to be crucial to the determination of the issues reserved for the second phase of this trial (e.g. common law business torts), the Court believes that the question of patent misuse properly should be litigated during the second phase of this bifurcated trial and will rule on the matter then.

## VI.

### Attorney Fees

 35 U.S.C. § 285 authorizes the Court to award reasonable attorney fees to the prevailing party upon a finding that an action is an "exceptional case." *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047 (Fed.Cir.1987). To declare a case "exceptional," the Court must find unfairness, bad faith, or inequitable conduct of the patentee. *Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1364 (Fed.Cir.1990) (citation omitted).

There is evidence that this might be an "exceptional case." The party requesting an award of attorney fees has a high burden of proof, however, and whether or not the burden has been met directly relates to the level of egregiousness of Defendant's conduct. Since conclusive proof about whether attorney fees should, or should not, be granted is not likely to be established until the second phase of trial, which will deal with Defendant's alleged business torts, the Court will reserve a ruling in this matter until the end of the second phase of trial.

### ORDER AND JUDGMENT

The Court having heard the evidence, having received and considered the jury verdict and having issued a Memorandum Opinion concerning certain issues, which are appropriate for the Court to decide, and being otherwise sufficiently advised,

breath analysis devices using a dry-gas carrier. As yet the Court has seen no credible evidence to

IT IS HEREBY ORDERED AND ADJUDGED that CMI's Intoxilyzer 5000, using dry gas with an extruded aluminum IR cell, does not infringe United States Patent No. 4,495,418;

IT IS FURTHER ORDERED that CMI is not entitled to judgment that United States Patent No. 4,495,418 is invalid based upon the jury's verdict and the judgment thereon, all of which is attached to this Order and which is also filed separately;

IT IS FURTHER ORDERED that CMI is not entitled to judgment that United States Patent No. 4,495,418 is unenforceable on the ground of inequitable conduct before the Patent and Trademark Office;

IT IS FURTHER ORDERED that the Court's previous ruling granting a stay of discovery is LIFTED and the parties are permitted to pursue discovery related to the second phase of this litigation;

The Court expects the parties to file all necessary and appropriate post-trial motions, specifically those related to the jury verdict. Because the case has been bifurcated, however, neither the jury verdict nor this order is designated as final and appealable.

support this assumption. But this will be decided with finality in the second phase of the trial.