HOGANAS AB, Plaintiff–Appellant,

v.

DRESSER INDUSTRIES, INC.,
Defendant–Appellee.

No. 92–1526.

United States Court of Appeals,
Federal Circuit.

Nov. 10, 1993.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Jan. 7, 1994.

Richard Linn, Marks & Murase, Washington, DC, argued for plaintiff-appellant. Of counsel was Peter A. Dankin.

Roy W. Hardin, Richards, Medlock & Andrews, Dallas, TX, argued for defendant-appellee. With him on the brief was V. Bryan Medlock, Jr. Thomas R. Felger, Baker & Botts, L.L.P., Dallas, TX, represented defendant-appellee.

Before PLAGER, Circuit Judge, SMITH, Senior Circuit Judge, and CLEVENGER, Circuit Judge.

PLAGER, Circuit Judge.

This is a patent infringement case which comes to us by way of appellant Hoganas AB's (Hoganas) appeal of the decision of the District Court for the Western District of Pennsylvania, Civil Action No. 89–304, granting appellee Dresser Industries, Inc.'s (Dresser) motion for summary judgment of non-infringement of U.S. Patent No. 3,982,-953 (the '953 patent), both literally and under the doctrine of equivalents. We *affirm.*

## I. BACKGROUND

Hoganas is the owner of the '953 patent.[1] That patent is directed to a particular composition of materials used to form monolithic refractory linings for industrial furnaces.[2] The composition is configured to minimize the time required for drying when such a lining is first applied to the furnace in a wet and pasty state. Attempts had been made to speed up the drying process, and thus minimize the required down-time, through the application of heat. However, these attempts were not entirely successful because, with the available compositions, there was no means of relieving the pressure that built up as the water evaporated into steam. The result was that the lining might explode during the drying process.

With the claimed composition, this problem is solved through the addition of "straw-shaped, channel-forming elements." These elements function to form channels which release the steam that builds up as heat is applied in the drying process. Accordingly, they prevent the explosions that occurred with prior compositions and thus allow the drying process to progress more quickly.

That patent contains 7 claims, of which claim 1 is the broadest:

1. In a refractory mass of the type used for casting, ramming or stamping refractory linings and for metallurgical ladles or tapping channels and composed of 60 to 95% by weight of refractory grog and 40 to 5% by weight of binder, the improvement which comprises said mass further containing 0.05 to 0.35% by weight, based on the solids content of the mass without any additive, of straw-shaped, channel-forming elements equally distributed throughout the mass, whereby rapid drying of the mass is made possible.

On June 6, 1988, Hoganas filed suit against Dresser in the District Court for the Central District of California (where Dresser apparently had an established place of business), alleging that a refractory composition manufactured by Dresser (bearing the "Adtech" trade name), infringed the '953 patent. That action was subsequently transferred to the District Court for the Western District of Pennsylvania, the location of the specific Dresser division which manufactured the Adtech product.

On April 30, 1989, Dresser filed a motion for summary judgment of non-infringement. In support of that motion, Dresser submitted relevant excerpts of the '953 prosecution history, the affidavit of Thomas R. Kleeb, one of its employees, and an excerpt from the deposition of James F. Benzel, apparently Hoganas' expert. In opposition to that motion, Hoganas submitted Mr. Benzel's affidavit.

---

1. The patent issued on September 28, 1976, and thus expired on September 28, 1993.

2. Refractory linings are linings capable of withstanding high temperatures, *i.e.,* 1000 °F or more.

On December 17, 1991, the court appointed, with the consent of the parties, a special master to decide the motion. On March 20, 1992, the special master issued a report recommending that the motion be granted. The special master focused on the "straw-shaped, channel-forming elements" limitation. He concluded it was not literally met by the corresponding element in the Adtech product, vinyl chloride acetate fibers, because these fibers "are so fine as to be barely visible by the unaided eye," and thus "bear no resemblance to straw." He also concluded this limitation was not met under the doctrine of equivalents because Hoganas, through prosecution history estoppel, had relinquished coverage of compositions employing "capillary-size" fibers, including the acetate fibers in the accused product.[3]

On April 19, 1992, the district court adopted the special master's report as the opinion of the court[4], and entered judgment of non-infringement. This appeal followed.

## II.  DISCUSSION

### A.

■ On appeal of a grant of summary judgment, we independently review the record to determine whether any errors of law were made or whether there are any material issues of disputed fact that remain. *E.g., London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1537, 20 U.S.P.Q.2d 1456, 1458 (Fed.Cir.1991). If neither is the case, we must affirm.

3. According to the Benzel deposition excerpt, which is unchallenged, a capillary-sized fiber is one having a diameter of 100 microns or less. The Kleeb affidavit, which is also unchallenged, establishes that the acetate fibers in the Adtech product have a diameter of 15 microns. Thus, they are capillary-sized.

4. Therefore, the special master's conclusions are the district court's conclusions.

5. It is undisputed that the acetate fibers in the accused product are much smaller than straw.

6. There is no inconsistency between this conclusion and our conclusion, discussed later in this

### B.

■ Hoganas argues that the district court erred in its literal infringement analysis. According to Hoganas, the court erroneously interpreted the "straw-shaped, channel-forming elements" limitation to mean "straw-sized."[5] This was error, argues Hoganas, because that limitation, when properly interpreted, does not impose any requirement as to size.

■ We agree. It is improper for a court to add "extraneous" limitations to a claim, that is, limitations added "wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433, 7 U.S.P.Q.2d 1129, 1131 (Fed.Cir.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). That appears to be what the district court did, however, by emphasizing the smallness of the fibers. The phrase "straw-shaped" unambiguously relates to *shape* not *size*. Thus, it was improper for the court to use that phrase as the vehicle for incorporating a size limitation into the claim.[6]

Nevertheless, we have concluded that any error committed by the district court in this regard is harmless. Based on our independent review of the record, we have concluded the "straw-shaped" limitation imposes the requirement that the channel-forming elements be *hollow*.[7] Because the acetate fibers in the Adtech product are solid, that product does not literally infringe any claim of the '953 patent.

opinion, that Hoganas relinquished coverage of capillary-sized elements for purposes of assessing infringement under the doctrine of equivalents. By its very nature, the doctrine of equivalents operates outside the literal language of claims. Accordingly, through prosecution history estoppel, an applicant can be estopped from obtaining coverage of a particular range of equivalents even though the estoppel does not find expression in one of the claim terms.

7. We note that this is the interpretation adopted by the trial court in *Hoganas, A.B. v. A.P. Green Indus., Inc.*, 806 F.Supp. 998 at 1003, 26 U.S.P.Q.2d 1795 (W.D.Ga.1992), after a full bench trial.

■ Our interpretation is fully supported by the ordinary meaning of the term "straw." [8] Although a patentee can be his own lexicographer, as we have repeatedly said, the words of a claim "will be given their ordinary meaning, unless it appears that the inventor used them differently." *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1579, 6 U.S.P.Q.2d 1557, 1560 (Fed.Cir.1988) (citing *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759, 221 U.S.P.Q. 473, 477 (Fed.Cir.1984)). Based on our review of the '953 specification and prosecution history, we are not convinced the '953 inventors used this term differently from its ordinary meaning. For example, the specification provides several examples of channel-forming elements, *viz.*, "straw or stalks of common cereals, grass, reed or similar natural materials," [9] or "[s]traw-shaped synthetic elements, e.g., made from paper, plastic or other organic materials," [10] such as "cut pieces of plastics [sic] sipper straw." [11] None of these examples are identified as being solid, and most if not all, are unquestionably hollow.[12] Although the documentation does not expressly identify the hollowness characteristic as contributing to the inventive concept, it is not inconsistent with that concept either. Moreover, a significant and possibly critical contribution for this feature can be readily inferred: it permits the release of steam before the elements are burned away, and, by reducing the amount of ash which is formed as the elements burn out, it reduces the risk that the channels will become clogged.

For all the foregoing reasons, we conclude one of skill in the art, the vantage point from which the proper interpretation of the claim is ultimately determined [13], would not have been put on notice that the term meant other than what it says. Such a one would be perfectly justified in giving the term its ordinary meaning. If Hoganas, who was responsible for drafting and prosecuting the patent, intended something different, it could have prevented this result through clearer drafting. For example, as discussed at the hearing, the phrases "cylindrically-shaped" or "rod-shaped" could have been used. It would not be appropriate for us now to interpret the claim differently just to cure a drafting error made by Hoganas. That would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention.

Hoganas argues that this interpretation is not supportable because the phrase "straw-shaped" refers to the general "elongated and thin" silhouette of the elements, and thus includes hollow and solid elements. We disagree. According to a dictionary definition provided by Hoganas, the term "shape" means the "external surface" of an object. Since the hollowness of straw *is* part of its external surface (in the sense it is exposed to the external environment and thus visible to an observer), that characteristic is part of its shape and thus included within the phrase "straw-shaped." [14] Thus, Hoganas' interpretation is the one that is insupportable.

Accordingly, we affirm the district court on the literal infringement issue.

### C.

■ Hoganas next argues that the district court erred in its analysis of the doctrine of equivalents issue. According to Hoganas, the court erred in concluding that Hoganas, through prosecution history estoppel, had relinquished coverage of capillary-sized fibers.

■ The essence of prosecution history estoppel is that a patentee should not be able to obtain, through the doctrine of equiva-

---

**8.** According to Webster's New World Dictionary, Third Edition, the term "straw" means *"hollow* stalks or stems of grain after threshing" or "a *tube* of waxed paper, plastic, etc., used for *sucking* beverages." (Emphasis added).

**9.** Col. 1, 11. 65–66.

**10.** Col. 1, 11. 66–68.

**11.** Col. 3, 11. 13–14.

**12.** For example, plastic "sipper" straw is unquestionably hollow.

**13.** *See Smithkline Diagnostics Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 882, 8 U.S.P.Q.2d 1468, 1471 (Fed.Cir.1988).

**14.** A hollow sphere might present a different case because its hollowness is *not* part of its external surface.

lents, coverage of subject matter that was relinquished during prosecution to procure issuance of the patent. *See Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870, 228 U.S.P.Q. 90, 96 (Fed.Cir.1985). The legal standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent. *See Prodyne Enters., Inc. v. Julie Pomerantz, Inc.*, 743 F.2d 1581, 1583, 223 U.S.P.Q. 477, 478 (Fed.Cir.1984); *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389, 222 U.S.P.Q. 929, 933 (Fed.Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985).[15]

■ Because prosecution history estoppel is a question of law,[16] we are free to undertake a complete and independent analysis of this issue.[17]

The examiner during prosecution issued an office action finally rejecting the claims for obviousness on the basis of Matheny, U.S. Patent No. 2,224,459. That patent discloses a composition for making porous, lightweight refractory insulating bricks which includes 1—50%[18] "shredded or comminuted paper." One purpose of the paper is to promote through capillary action[19] uniform drying of newly formed bricks prior to firing.[20] Another is to form channels for the release of steam caused during firing by the burn-out of other materials added to the composition used to make the bricks.[21]

In a subsequent response, Hoganas, without amending the claims (except to correct a typographical error), distinguished the Matheny reference on two principal grounds. The first was that the claimed composition called for only a small amount of channel-forming elements—0.05 to 0.35% by weight—in order to avoid unnecessary porosity which could impair the strength of the resultant lining.[22] Matheny, by contrast, argued Hoganas, called for a significantly greater amount, *i.e.* at least 1%, of paper. The second was that, unlike the comminuted paper in Matheny, the function of the claimed channel-forming elements was not to achieve capillary action, a phenomenon which involves liquid not steam. Consequently, argued Hoganas, "the thickness of the channel-forming elements would generally be 100 or more times the thickness of a material which would provide a capillary action."[23] The examiner subsequently allowed the claims.

15. Ordinarily, the test for determining the meaning of a claim term is from the vantage point of one skilled in the art. *See Smithkline Diagnostics*, 859 F.2d at 882, 8 U.S.P.Q.2d at 1471. This test would seem equally appropriate for determining what subject matter was relinquished in the context of prosecution history estoppel. Our precedent dealing with this specific question recites that the test is measured from the vantage point of a reasonable competitor. *See, e.g., Prodyne*, 743 F.2d at 1583, 223 U.S.P.Q. at 478. We do not see these formulations as necessarily inconsistent—the point is the knowledge of one reasonably skilled in the art who views the question from the perspective of a competitor in the marketplace.

16. *See Loctite Corp.*, 781 F.2d at 870, 228 U.S.P.Q. at 96.

17. *See Trayco, Inc. v. United States*, 994 F.2d 832, 835 (Fed.Cir.1993).

18. Matheny does not specify whether the percentages are *by weight* or *by volume*.

19. According to the McGraw–Hill Dictionary of Scientific and Technical Terms, Second Edition, the phrase "capillarity," which is synonymous with "capillary action," means a phenomenon that occurs with respect to *liquids* : "[t]he action by which the surface of a liquid where it contacts a solid is elevated or depressed, because of the relative attraction of the molecules of the liquid for each other and for those of the solid." This is consistent with the definition agreed to by the parties at oral argument.

20. Col. 1, ll. 18—21.

21. Col. 1, ll. 34—39.

22. This is repeated in the specification. Col. 2, ll. 34–36.

23. The full paragraph of the response in which this statement was made reads:

[I]t is further clear that [Matheny] is directed to a method for producing capillary action in the material. A capillary action is completely different from the type of action obtained with the channel-forming elements of the present invention. *Thus, the thickness of the channel-forming elements would generally be of a magnitude of 100 or more times the thickness of a material which would provide a capillary ac-*

The district court focused solely on this latter distinction to conclude that Hoganas had relinquished coverage of capillary-sized fibers. We see no error in this conclusion. In our view, a reasonable competitor could have concluded, from a reading of the prosecution history, that the examiner relied on this distinction in allowing the claims, and thus, that Hoganas had given up coverage of subject matter incorporating this distinction.

Hoganas argues such a conclusion ignores the rule that any estoppel created by an applicant's argument "encompasses *all* of [the] *combined* distinctions" over the cited references. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 824, 23 U.S.P.Q.2d 1426, 1433 (Fed.Cir.1992). According to Hoganas, had the court properly applied this rule, it would have concluded that Hoganas ·gave up at most subject matter incorporating both of the two principal distinctions made by Hoganas over Matheny, *i.e.*, compositions (1) containing capillary-sized fibers (2) in percentages greater than 1%, the minimum percentage specified in Matheny. Since there is no evidence in the record of the percentage of acetate fibers that are present in the Adtech product, according to Hoganas, summary judgment on the doctrine of equivalents issue was inappropriate.

We cannot agree. The distinction made by Hoganas based on the percentage of fibers or elements added to the composition is of questionable validity in terms of distinguishing over Matheny. As noted, Matheny did not expressly indicate whether the percentages disclosed in that reference were *by weight* or *by volume*. However, in the prosecution history, Hoganas stated that these percentages were *by volume*. Thus, a reasonable competitor was entitled to conclude, from the '953 prosecution history, that Hoganas' characterization of Matheny was correct, and thus that the claimed percentages could substantially overlap the percentages disclosed in Matheny

(for example, a percentage of 1% *by volume* could, depending on the circumstances, be the same as a percentage of 0.35% *by weight*). Consequently, such a one would not be justified in concluding the examiner relied on this distinction in allowing the claims, or in concluding the relinquished subject matter incorporated this distinction. The rule espoused in *Read* has no applicability in such a case.

Hoganas next argues that even if an estoppel was created on the basis of the one distinction, Hoganas only relinquished coverage of compositions having elements employing capillary *action* not capillary-*sized* elements. This argument, however, is unpersuasive. As noted earlier, in its response to the examiner's rejection, Hoganas specifically mentioned capillary size and indicated that the ability to perform capillary action was determined by size. A competitor would thus have been perfectly justified in concluding that Hoganas gave up coverage of capillary-sized fibers.

Moreover, considering that the accused fiber indisputably functions, in part, through capillary action[24], the distinction being argued by Hoganas would seem to have no significance. The accused product would still be within the class of relinquished subject matter, and thus avoid infringement under the doctrine of equivalents.

Perhaps Hoganas' point is that the accused fiber does not operate *solely* or *principally* through capillary action.[25] But neither does the comminuted paper in Matheny. According to that reference, the comminuted paper performs several significant functions besides distributing water through capillary action. Consequently, the subject matter that Hoganas relinquished is not limited to compositions containing fibers or elements which

*tion.* Moreover, the action of the capillary is primarily to retain liquid which is opposite from the purpose of the channels utilized in the present invention. (Emphasis added).

**24.** At oral argument Dresser asserted, and Hoganas did not dispute, that the fiber shrinks well before the point at which water turns to steam, and thus forms capillary-sized channels which

help distribute the water more evenly throughout the lining. As a result, pockets of water are eliminated, and the risk of explosion is further reduced.

**25.** It is undisputed that the channels formed by the accused fibers perform the additional function of releasing the steam formed as the water evaporates.

function *solely* or *principally* through capillary action.

For all the foregoing reasons, the district court did not err in its judgment of noninfringement under the doctrine of equivalents.

### D.

■ Our conclusion is fully supported through consideration of the function/way/result test set forth in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, *reh'g denied*, 340 U.S. 845, 71 S.Ct. 12, 95 L.Ed. 620 (1950). To satisfy this test, Hoganas bore the burden of showing that each limitation of the claim is met by a literal or equivalent element in the accused product. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259, 9 U.S.P.Q.2d 1962, 1967 (Fed.Cir.1989). Thus, it bore the burden of showing that the solid acetate fibers in the accused product were the equivalent of the hollow "straw-shaped" elements of the patented composition. In opposition to the summary judgment motion, Hoganas had to show that there was a genuine factual dispute on this issue requiring resolution at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

We have concluded that Hoganas did not do so. Although the acetate fibers in the Adtech product and the claimed channel-forming elements perform the same overall function—promoting the rapid drying of refractory linings by reducing the risk of explosions—the two do so in a different way.

The claimed channel-forming elements, being hollow, provide in their natural state channels for the release of steam, and during the process of drying the refractory lining, they are at least partly burned away[26] to form channels of expanded diameter. The acetate fibers in the accused product, by contrast, function in two steps. First, they shrink well below the temperature at which water turns to steam, and thus leave channels which distribute, through capillary action, the water more evenly throughout the lining. Second, as the temperature increases and the liquid turns to steam, the fibers melt and the channels perform the additional function of releasing the steam.

The evidence Hoganas has submitted on this point, consisting entirely of the Benzel affidavit, is both incomplete and conclusory. As a matter of law, the accused fiber does not function in substantially the same way as the claimed "straw-shaped" element, and thus is not the equivalent of that element. A contrary conclusion would be error.

In support of our conclusion, we note that the Patent & Trademark Office (PTO) granted to Dresser a patent (U.S. Patent No. 4,430,439) covering the Adtech product with knowledge of the '953 patent, which is listed as art of record.[27] Thus, the PTO must have considered the accused product to be nonobvious with respect to the patented composition. Accordingly, the issuance of that patent is relevant to the equivalence issue.[28]

In further support of our conclusion, we note that Hoganas' invention is only a modest advance over Matheny, and thus is not entitled to pioneering status or the broad range of equivalents which normally accompanies that status. Moreover, Hoganas is not entitled to a range of equivalents which would erase "meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Perkin–Elmer Corp. v. Westinghouse Elec.*

---

26. Col. 2, ll. 1–3.

27. Although that patent is not part of the record on appeal, it was referred to at the argument, and is publicly accessible. Accordingly, we have taken judicial notice of it. *See* Fed.R.Evid. 201(b)(2); *see also Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 514 n. 3, 13 U.S.P.Q.2d 2029, 2031 n. 3 (Fed.Cir.1990) (appropriate to take judicial notice of PTO correspondence which is part of the public record).

28. In *Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1580 n. 3, 224 U.S.P.Q. 409, 417 n. 3 (Fed.Cir.1984), we said that the issuance of a patent on an accused product or process was relevant to the equivalence issue if that patent was issued on the basis of "unexpected results" over the prior art. Understanding a finding of "unexpected results" to be tantamount to a finding of nonobviousness, we conclude the issuance of Dresser's patent is relevant to the equivalence issue in this case.

*Corp.,* 822 F.2d 1528, 1532, 3 U.S.P.Q.2d 1321, 1324 (Fed.Cir.1987). But that would be the effect of concluding that the accused product infringes under the doctrine of equivalents. As we noted earlier in this opinion, the phrase "straw-shaped" means that the claimed elements are hollow, while the accused fiber is solid. A conclusion that a solid fiber is equivalent to a hollow "straw-shaped" element would eviscerate the plain meaning of that phrase. Our conclusion on the doctrine of equivalents issue is thus fully supported.

### III. CONCLUSION

We have considered all the remaining arguments made by the parties, and find them to be either unpersuasive or not dispositive. Therefore, we ***affirm*** the judgment of non-infringement by the district court.

***AFFIRMED.***