**LUCAS AEROSPACE, LTD., Plaintiff & Counter Defendant,**

v.

**UNISON INDUSTRIES, L.P., Defendant & Counter Claimant.**

**Civ.A. No. 93–525 MMS.**

United States District Court, D. Delaware.

June 2, 1995.

Robert H. Richards, III, of Richards, Layton & Finger, Wilmington, DE. Karen L. Hagberg, Gary M. Rinck, and Nancy R. Thomas, of Morrison & Foerster, New York City, for plaintiff.

William J. Marsden, Jr., and Joanne Ceballos, of Potter Anderson & Corroon, Wilmington, DE. Berton Scott Sheppard, Charles H. Mottier, and John B. Conklin, of Leydig Voit & Mayer, Chicago, IL, for defendant.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

Unison Industries Limited Partnership ("Unison") holds four United States Patents that cover a class of devices generally known as ignition exciters or igniters. *See* U.S. Patent 5,065,073; U.S. Patent 5,155,437; U.S. Patent 5,245,252; U.S. Patent 5,343,-154.[1] Igniters are devices that generate a spark to ignite fuel in turbine engines. Lucas Aerospace, Ltd., ("Lucas") manufactures igniters potentially covered by Unison's patents and consequently commenced this action seeking a declaratory judgment of invalidity and non-infringement of the four patents, as well as asserting claims sounding in antitrust and unfair competition. *See* Docket Item ("D.I.") 63 (Amended Complaint). Unison counterclaimed that several Lucas products infringed the igniter patents. After severing the patent from the antitrust and unfair competition claims pursuant to Federal Rule of Civil Procedure 42(b), the Court conducted a twelve day jury trial on the patent issues. On the eleventh day of trial, the Court concluded, after conducting an exhaustive review of the appellate caselaw extant at that time, that the jury must construe disputed patent claims when extrinsic evidence is presented to explain the disputed language. *See* Trial Transcript ("Tr.") at 2469–2474.[2]

---

1. The '073 patent uses the spelling 'ignitor,' while the remaining three patents use the spelling 'igniter.' The Court will use the latter spelling except in quotations from the '073 patent.

2. The jury's attempt at claim construction appears in the special interrogatories. *See* D.I. 373.

Just eight days later, on April 5, 1995, the United States Federal Circuit Court of Appeals held "that in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim. As such, '[a] patent covers the invention or inventions which the court, in construing its provisions, decides that it describes and claims.'" *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) (in banc); *see also id.* at 971 ("we conclude that the interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court").[3] In the aftermath of *Markman*, both Lucas and Unison have requested the Court to revisit its decision and to construe the patent claims as a matter of law. Accordingly, the Court's claim construction follows.[4]

## I. APPLICABLE LEGAL STANDARDS

■■■ To construe patent claims means to ascertain the meaning of those claims in light of three primary sources: the claims, the specifications, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d at 979–80 (citations omitted). The Court must construe patent claims in the same manner the claims would be construed by those skilled in the art, *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed.Cir. 1985),[5] and the Court should not construe patent claims in a manner that renders claim language meaningless or superfluous, *see, e.g., Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed.Cir.1993), *cause dismissed*, 1994 WL 745517 (Fed.Cir. Feb. 7, 1994). At the same time, "[i]t is a well-established axiom in patent law that a patentee is free to be his or her own lexicographer ... and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings." *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir.1990) (internal citation omitted), *cert. dismissed*, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims.... The caveat is that any special definition given to a word must be clearly defined in the specification." *Markman v. Westview Instruments, Inc.*, 52 F.3d at 980 (internal citations omitted).

■■■ While the specification may define terms used in the claims, the claims define the precise scope of the patent. *Autogiro Co. of America v. United States*, 384 F.2d 391, 395, 181 Ct.Cl. 55 (1967). For example, references in the specification to a preferred embodiment, or an illustrative example, do not limit the scope of the patent claim. *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed.Cir.1988). "The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Markman*

---

**3.** The Court notes that *Markman* creates a practical problem in courtroom administration that the Court confessedly does not know how to solve: How does the Court construe claims as a matter of law at the close of evidence without disrupting the jury? For example, in this case the evidence phase of the trial took 11 days and over 2900 pages of trial transcript. Much of the trial testimony consisted of competing expert explanations of claim constructions. To construe the claims before giving the case to the jury requires immediate access to a trial transcript, i.e., daily copy which creates a not insignificant expense to the parties (an important factor whenever non-Fortune 500 inventors brush up against a deep pocket defendant), rapid briefing by the parties, and hopefully an opinion by the court. In this case it probably would have taken no less than five days for the parties to file helpful briefs and the court to memorialize its holdings on claim construction in a meaningful manner. If the jury were sent home during this period, there

is a very real chance that many of the facts important to resolving the infringement issues will have been forgotten. Twenty-one years of trial experience convinces me that any jury hiatus should be avoided if at all possible. One can argue that one should take less time with claim construction, but is that fair to the litigants when claim construction more often than not determines the outcome on infringement?

**4.** The Court reaches the same conclusion as the jury on 5 of the 8 disputed portions of the claim language.

**5.** The parties agreed that a person of ordinary skill in the art would possess at least two years of technical engineering training at the college level plus another year or two working on ignition system circuit design. Tr. at 2809–10 (Instructions of the Court to the Jury).

*v. Westview Instruments, Inc.*, 52 F.3d at 980. Thus, the fact that a claim may be broader than the preferred embodiment disclosed in the specification is of itself no moment, and conversely, the claims are not limited to devices operated precisely as the specification described devices operate, unless the specification *requires* a certain limitation. *Lemelson v. United States*, 752 F.2d 1538, 1552 (Fed.Cir.1985); *see, e.g., Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed.Cir.1988) (references in specification to preferred embodiment with a square shaft "not a basis here for limiting 'non-circular' to square or regular polygonal shafts"), *cert. denied*, 490 U.S. 1068, 109 S.Ct. 2069, 104 L.Ed.2d 634 (1989). Finally, the Court should take care not to confuse the patentee's use of the specification as a dictionary to define particular words and phrases in a claim, which is proper, with reading limitations into a claim from the specification "wholly apart from any need to interpret what the patentee meant by particular words or phrases." *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988); *see also Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir.1994) ("[C]laims are not to be interpreted by adding limitations appearing only in the specification.... Thus although the specifi-

cations may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.") (internal citations omitted).[6]

▮ In contrast to the claim, the specification, and the prosecution history, the Court may refer to extrinsic evidence only to aid the Court's understanding of the claim language. *Markman v. Westview Instruments, Inc.*, 52 F.3d at 981–82. Extrinsic evidence includes all evidence external to the claims, the specification, and the prosecution history, and the Court may use extrinsic evidence to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent. *Id.* at 980–81. However, because the Court construes patent claims as a matter of law, the Court does not make credibility assessments or other factual findings based on the extrinsic evidence. Instead, the Court "receive[s] extrinsic evidence in order 'to aid the court in coming to a correct conclusion' as to the 'true meaning of the language employed' in the patent." *Id.* at 980 (citations omitted). As a final caveat, extrinsic evidence "amounts to no more than legal opinion" as to proper claim construction, and extrinsic evidence therefore cannot be relied upon to change the true meaning of the patent claims. *Id.* at 983.[7]

**6.** At this point, the Court would normally discuss use of the prosecution history, or "file wrapper," as a means to ascertain the meaning of the patent claims. *See Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 701–02, 15 L.Ed.2d 545 (1966). Other than introducing the file wrappers into evidence, however, the parties did not discuss the file wrappers during the presentation of the evidence and, with two exceptions, have not cited or discussed them in their legal briefs on claim construction as a matter of law. *See* Tr. at 43, 1977, 2030, 2188, 2777; D.I. 368 at 10; D.I. 376 at 3 (collecting locations where the parties mentioned the prosecution history without mentioning the relevance or importance to any of the issues in the case). Apparently, the parties feel there is nothing in the file wrappers pertinent to claim construction, and, after perusing the file wrappers at its own behest, the Court has reached the same conclusion.

**7.** This somewhat startling conclusion that the trial judge "does not make credibility assessments" apparently derives from the in banc court's more general holding that no issue of

claim construction presents a question of fact for the jury. As I understand *Markman*, because claim construction presents a purely legal question, trial judges must ignore all non-transcribible courtroom occurrences such as a witness's body language, inability to maintain eye contact when confronted with a telling question, hesitance or delay in giving an answer, an affirmative answer in a voice revealing the truthful answer is "no," or the changing demeanor of a witness when shifting from sure to treacherous footing. All of the preceding occurred in this trial. When two experts testify differently as to the meaning of a technical term, and the court embraces the view of one, the other, or neither while construing a patent claim as a matter of law, the court *has* engaged in weighing evidence and making credibility determinations. If those possessed of a higher commission wish to rely on a cold written record and engage in *de novo* review of all claim constructions, that is their privilege. But when the Federal Circuit Court of Appeals states that the trial court does not do something that the trial court does and must do to perform the judicial function, that court know-

## II. CLAIM CONSTRUCTION

The parties dispute the meaning of eight portions of the patent claims at suit. *See* D.I. 367, 368, 376, 377. The Court will discuss each of the contended portions of the claim language in turn, including the parties' proposed claim constructions and the Court's claim construction as a matter of law.

A. *'073 Patent Claim 1*—"a voltage converter for receiving a low voltage from a system source and converting it to a high DC output voltage"

█ Lucas contends that the phrase 'high DC output voltage' as used in this claim is ambiguous and that, therefore, the Court must look at the claim structure and patent specification to ascertain the phrase's meaning. Based on these sources, Lucas asserts as a matter of law that " 'high DC output voltage' . . . does not cover the 800 volts to which Lucas charges its capacitor," D.I. 367 at 2; *id.*, appendix ("app.") A at 1, and, in the alternative, that " 'high DC output voltage' . . . means the voltage to which the capacitor that is coupled to the voltage converter is charged, and is substantially the same as the voltage that appears at the igniter plug," D.I. 376 at 2–3. Unison rejoins that 'high DC output voltage' refers to the relative DC output voltage produced by the voltage converter as compared to the DC input voltage received by the same converter. Unison also contends that quantifications of the voltage converter output found in the specification describe the preferred embodiment of the invention and thus do not limit the scope of the claim. D.I. 368 at 4–5; D.I. 377 at 11–12.

The Court finds as a matter of law that the phrase 'high DC output voltage' refers to the relative value of the voltage converter output as compared to the voltage converter input. This conclusion flows from the plain language of the claim. Claim 1 of the '073 patent

describes "a system for igniting fuel for a turbine engine," '073 patent, col. 15 at ln. 64, comprised of seven elements, the first of which is "a voltage converter for receiving a low voltage from a system source and converting it to a high DC output voltage," *id.* at ln. 66–68. Looking at the claim structure as a whole, the phrase 'high DC output voltage' only qualifies and describes the role of the voltage converter in the "system for igniting fuel for a turbine engine." While the claim does not quantify the phrase 'high DC output voltage' directly, the claim does quantify this term by placing 'high DC output voltage' in contradistinction to the voltage converter input, "a low voltage."

Lucas cannot use specific output voltages mentioned in the specification to produce a limitation on the scope of the claim unwarranted by the claim language itself. Nothing about the phrase 'high DC output voltage' indicates that it is a term of art unique to this patent and therefore requiring the specification to provide an exact numerical value. Furthermore, nothing about the phrase 'high DC output voltage' indicates that one skilled in the art would require reference to the specification to determine the meaning of the phrase as it relates to converting the aircraft power supply to a voltage level usable by an electronic device.

Both the extrinsic evidence adduced at trial and the patent specification bear out this conclusion. The extrinsic evidence indicated, for example, that the typical aircraft power bus supplies avionics and other aircraft electronics, including the ignition exciters in suit, with a low DC voltage, usually 28 volts. *See also* '073 Patent, col. 5 at ln. 55–56. Most aircraft electronics do not operate at 28 volts DC and therefore utilize some form of voltage conversion circuitry to make the aircraft voltage useable by the electronic device. Voltage conversion circuits are not unique, however, and one skilled in the art may tailor

ingly enters a land of sophistry and fiction. *Cf.* James Finn Garner, *The Emperor's New Clothes, in Politically Correct Bedtime Stories* 5 (1994). As a consequence, bound by slavish adherence to the fiction that a judge does not make credibility determinations when confronted with testimonial extrinsic evidence en route to pronouncing the "true" meaning of a patent claim, this opinion has been crafted in a manner that leaves the

reader, and the reviewing court, uninformed as to the credibility assessments which, as always, are necessary precursors to the acceptance or rejection of testimonial evidence from competing experts. In fairness to all, those assessments unavoidably have been made in evaluating all testimony and in connection with exhibits relating to claim construction.

a voltage converter design to produce the specific voltage necessary to optimize operation of the electronic device.

This extrinsic evidence is in harmony with the specification. The specification states that "[m]any types of DC–to–DC converters well known in the art may be utilized in the ignition system of the invention." *Id.*, col. 5 at ln. 65–67. Furthermore, in its discussion of the invention's preferred embodiment, the specification notes that "it will be appreciated by those skilled in the design of ignition systems that other variations of flyback converters or other types of DC–to–DC converters may be substituted without deviation from the spirit of the invention." *Id.*, col. 6 at ln. 9–13. The use of voltage converters is not uncommon or unique, and the claim language at issue dictates no more than use of a circuit fairly recognized by those skilled in the art.

Lucas also argues that because the '073 patent inventor, John Frus, believes 2500 to 3000 volts are required to create a useful spark and the Lucas exciter sparks at the 800 volts DC produced by its voltage converter, the scope of the claim does not include its device. In addition, Lucas contends the claim language requires the voltage seen at the plug to be the same as the voltage seen at the output of the voltage converter. This argument is of no avail; if the Court accepts this proposed construction Lucas will have succeeded in adding a claim limitation "wholly apart from any need to interpret what the patentee meant by particular words or phrases." *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). The fact that Frus believes igniters operate best at 2500 to 3000 volts does not merit recasting the claim language to include a numerical limitation. Furthermore, assuming that the 2500 to 3000 volt threshold *is* critical to the invention, it seems absurd that the only place

this limitation appears in the claim is in the definition of the voltage converter, a circuit common to almost all avionics and aircraft electronics. In sum, no reason exists in the claim or the specification to create a numerical quantity to define the term 'high DC output voltage.'[8]

B. *'073 Patent Claim 1*—"a unidirectional device ... for ensuring a unipolar current across the gap of the plug"

 Lucas relies on the testimony of its expert, Martin Schlect, to assert that the phrase 'unipolar current' refers to a current waveform that flows entirely in one direction, as opposed to a bipolar current which would flow in two directions. D.I. 367 at 3; *id.*, app. A at 2; *see* Tr. at 1988, 2173–74 (testimony of Schlect) (stating that 'unipolar' has the same meaning to one skilled in the art as it does for a lay person, i.e., that unipolar means "one direction"). Unison, in contrast, argues that 'unipolar current' must be construed within the physical limitations of the unidirectional electronic devices that, according to the claim, are used to create a unipolar current. Thus, according to Unison, the unidirectional device acts as a structural limitation on the claim language such that one skilled in the art would understand that a unipolar current is not equivalent to current flowing exclusively in one direction through the circuit. D.I. 368 at 6–7.

The Court holds as a matter of law that the phrase 'unipolar current' must incorporate the structural limits associated with the physical properties of the unidirectional device and that, therefore, 'unipolar current' does not take on its literal meaning when used in claim 1 of the '073 patent. This construction of 'unipolar current' stems from the structure of the claim; because the claim states that the unidirectional device is to 'ensure' the unipolar current, the Court cannot accord to the phrase 'unipolar current' a meaning that is physically impossible to

---

8. The Court also notes that Lucas' witness Godfrey, Chief Engineer of Lucas Aerospace Switchgear & Ignition Division, exhibited the same understanding of the role of the DC voltage converter as that set out in the Court's construction of this claim. Testifying as one skilled in the art, Godfrey described the purpose of a DC voltage converter as to "bring a low voltage in and ... produce a high voltage out." Tr. at 1685; *see generally* Tr. at 1683–85. This generic description of the voltage converter further demonstrates the completeness of the claim language without supplementation from the specification.

achieve given the limitations of unidirectional devices available in the market today.

Persons skilled in the art from both Lucas and Unison testified that the physical and electrical imperfections in unidirectional devices prevent implementation of a waveform oriented strictly in a single direction. Lucas' engineer Godfrey, for example, testified that he had never seen a circuit that did not have some form of ringing[9] when it transitions from the off state. Tr. at 1808. The inventor, John Frus, testified that "[u]nipolar circuit is an industry standard . . . of a type of circuit that includes . . . [a] freewheeling diode,"[10] Tr. at 2399, and that persons skilled in the art understand "ideal" polarity is seldom if ever achieved due to component and circuit imperfections, Tr. 2401–10. Frus even noted that ideal polarity is absent from the Unison implementation of the invention. Tr. at 2500. Schlect's testimony notwithstanding, the Court cannot accept a definition of unipolar that is not tied to the physical realities of the unidirectional devices that create the unipolar current.[11]

The Court notes, however, that this definition of 'unipolar current' does not subsume waveforms that one skilled in the art would understand to be bipolar. As illustrated by the Figures in the specification and the testimony of inventor Frus, bi-directional currents caused by imperfections in unidirectional devices are orders of magnitude less than the current which causes the ignition event.[12] For example, a current waveform flowing in positive and negative directions with equal amplitude throughout the ignition event would not be considered unipolar to one skilled in the art because such changes in

direction are most likely an intentional result of the circuit design. However, when the current direction fluctuates at a very small amplitude and on an order of magnitude in keeping with the imperfections of unidirectional devices, the waveform would be considered unipolar to one skilled in the art. In sum, the Court finds as a matter of law that the word unipolar must be construed in connection with the physical limitations of the unidirectional device which claim 1 of the '073 patent utilizes to "ensure a unipolar current."

C. *'073 Patent Claim 1*—"solid state means . . . such that the following sequence of event [sic] occurs"

The fifth element of claim 1 requires a:

solid state means including a switch means for transferring the energy accumulated by the capacitor to the series connected inductor and low tension ignitor plug such that the following sequence of event [sic] occurs: (a) a high voltage appears across the gap of the ignitor plug and begins to create a plasma, [sic] (b) a relatively slow current rise (di/dt) is initiated during transition of said switch means from a first state to a second state while sustaining the high voltage across the gap of the ignitor plug; (c) saturation of said magnetically saturable core occurs and a relatively fast di/dt occurs across the gap of low tension ignitor plug, thereby completing the generation of a spark across the gap

'073 Patent, col. 16 at ln. 11–24. Lucas asserts that this sequence of events is illustrated solely by the waveforms in Figures 3b and 4 (curve A) of the '073 patent. D.I. 367 at 5;

9. "Ringing" is a term of art that refers to oscillations in current direction caused by the physical and electrical imperfections in electronic devices.

10. Persons skilled in the art of power electronics typically use diodes as unidirectional devices.

11. Schlect did not state that "unipolar current" or "unipolar circuit" means to one skilled in the art a current or circuit with no ringing or leakage current due to the physical imperfections of unidirectional devices. Instead, Schlect very carefully defined only the word "unipolar," leaving it to the Court to infer that one skilled in the art would equate the phrases 'unipolar current'

and 'unipolar circuit' with the strict dictionary meaning of 'unipolar." *See* Tr. at 2173–74.

12. Because the physical limitations of the unidirectional device are negligible in magnitude compared to the primary unipolar discharge event, it is completely understandable that the Figure 4 illustrations of actual and theoretical current waveforms do not include, or, indeed, that the scale of Figure 4 would not permit showing, directional current changes due to the physical limitations of unidirectional devices. Furthermore, the Court finds that Figure 4 of specification illustrates, but does not limit, the plain scope of the patent claim.

*id.,* app. A at 3. Unison contends that the idealized waveform depicted in Figure 3b and the experimental waveform depicted in Figure 4 (curve A) merely illustrate the sequence of events required by this element of claim 1 and that the sequence of events described in this element is a word picture of the waveshaping explained in greater detail in the specification at columns 7, 8 and 9. Unison further contends that the disputed claim language requires only that the circuit have a solid state means for achieving the three events called out in the claim. D.I. 368 at 8–9.

The Court holds as a matter of law that the fifth element of the '073 patent claim 1 requires only that the solid state means create the sequence of events described in the claim. While the waveforms depicted in Figures 3b and 4 (curve A) may illustrate waveforms that fall within the scope of the claim, the contended claim language does not 'require' identity with those illustrations. Instead, the claim language describes the function performed by the solid state means in the invention.

In its brief, Lucas argues that because the inventor Frus stated the essence of the invention was the waveshaping scheme, and because Unison's expert Burton replied affirmatively to the question of whether "Figure 3b ... represents the kind of waveshape you get from the invention," Tr. at 1212, the contended claim language necessarily must be limited to Figures 3b and 4 (curve A). *See* D.I. 367 at 5–6. Certainly it is correct that the described sequence of events creates a current waveform at the igniter plug, and certainly it is correct, based on the testimony adduced at trial, that the described sequence of events represents the physical activity taking place at the igniter plug during the spark event. Nothing in the patent claim or specification, however, in any way 'requires' that the sequence of events create a waveform in exactly the shape depicted in Figures 3b and 4 (curve A). Instead, while Figures 3b and 4 (curve A) of the '073 patent may depict an example of a waveform produced as a result of the sequence of events at issue, the physical and electrical characteristics of the components implementing the waveshaping scheme, as well as the discharge duration and energy dissipation, will determine the actual shape of the waveform. Because a waveform of a different amplitude or period than that depicted in the Figures may well be created by a "solid state means ... for transferring the energy ... such that the following sequence of event [sic] occurs," the Court finds as a matter of law that the disputed claim language requires only a solid state means that achieves the sequence of events called out in the claim.

D. *'073 Patent Claim 17*—"a sensor incorporated into said inductive device"

 Lucas contends that the phrase "said inductive device" refers to a saturable core inductor and that the word sensor refers to a secondary winding on that inductor. D.I. 367 at 6; *id.,* app. A at 4. Lucas argues the patent specification limits the phrase "said inductive device" to saturable core inductors because the specification states that auxiliary voltage or current transformers which could be used as sensors "invariably cause insertion losses and are physically difficult to place in a circuit such as the exciter circuit for an ignition system. Furthermore, placement of an auxiliary transformer at an appropriate monitoring point can adversely affect waveforms instead of only monitoring them." '073 Patent, col. 10 at ln. 4–9. Unison responds that claim 17 does not require "said inductive device" to be the saturable core inductor and that the patent merely requires an inductive device incorporating a sensor "connected directly in the path of the spark current delivered to the igniter plug." D.I. 368 at 10–11. The Court notes that Lucas' proposed construction falls within the scope of that proposed by Unison, as the patent scope proposed by Unison encompasses multiple forms of inductive devices, including saturable core inductors, that incorporate sensors.

The Court holds as a matter of law that "said inductive device" means any inductive device incorporating a sensor "providing a diagnostic signal having electrical characteristics that represent the electrical and magnetic events occurring at the gap of the ignitor plug during the period of energy transfer to a spark across a gap of the ignitor

plug" that is also positioned in the ignition system in accordance with the requirements of the claim. Claim 17 of the '073 patent describes "a system for igniting engine fuel" comprised of six elements. The third element requires a series connection between an inductive device and igniter plug, the fourth element requires a "means for transferring energy" to "said" inductive device and igniter plug, and the fifth element requires that a sensor be incorporated into "said inductive device." Based on use of the referent "said," these three elements all refer to the same inductive device.

This claim language nowhere calls out or refers to a saturable core inductor. In contrast, claim 19 distinguishes itself from claim 17 by specifying use of an inductor that is "wound about a magnetically saturable core." '073 Patent, col. 18 at ln. 15–16. The "presumed ... difference in meaning and scope when different words or phrases are used in separate claims," *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed.Cir.1987), disappears, however, if the definition of claim 17's inductive device is limited to a saturable core inductor, and the doctrine of claim differentiation therefore counsels against adopting Lucas' proposed claim construction. *United States v. Telectronics, Inc.*, 857 F.2d 778, 783–84 (Fed.Cir. 1988), *cert. denied*, 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989); *see also Grain Processing Corp. v. American Maize–Products Co.*, 840 F.2d 902, 911 (Fed.Cir.1988) ("[i]t is improper to read the limitations of one claim into another"); *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1122 (Fed.Cir.1985) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement."). Furthermore, if the patentee had desired to require the inductive device to be the saturable core inductor, the claim could have said so.

Examination of the specification does not lead to a different result. The language Lucas relies upon for its proposed claim construction stems from a description of the preferred embodiment and not from a limitation placed on the inductive device. The specification demonstrates that the patentee was aware auxiliary transformers could perform the same function as the secondary windings on the saturable core inductor, but rather than limit claim 17's inductive device to a saturable core inductor, the specification instead describes how adding one or two wraps to the saturable core inductor is preferred over placing an auxiliary transformer in the circuit. *See* '073 Patent, col. 10 at ln. 4–9 (citing weight, physical space, current losses, and adverse effects on the waveform as disadvantages of using an auxiliary transformer). Despite their limitations, however, the specification notes that auxiliary transformers "[t]ypically are used for this purpose," *id.*, col. 10 at ln. 2–3, and nowhere in the specification does the patentee state that an auxiliary transformer may not be used. Instead, the inventor chose broad language in claim 17 that could include an auxiliary voltage transformer connected in series with the igniter plug. Based on the claim language and the specification, therefore, the court finds as a matter of law that the inductive device in claim 17 includes any inductive device that incorporates a sensor and that is placed in the ignition system in accordance with the requirements of the claim.

E. *'252 Patent Claim 1*—"a network interposed between the solid state switch and the igniter plug so as to form a series connection with the igniter plug and the solid state switch and, thereby, waveshape the voltage and current in order to efficiently ignite the fuel in the turbine engine"

■ Lucas contends that the phrase 'interposed between' creates a limitation on the arrangement of the network, solid state switch, and igniter plug such that the solid state switch, the network, and the igniter plug must be connected in series and in the specific order switch, network, plug. D.I. 367 at 7–8; *id.*, app. A at 5. Unison, in contrast, asserts that 'interposed between' does not refer "to a single discrete topological location" and that the physical location of the network in the ignition system is defined only in terms of the function of the network. D.I. 368 at 11–13.

The Court holds as a matter of law that the phrase 'interposed between' requires the network to occur at a specific location in the ignition system. Words used in a claim will normally be given their ordinary and accustomed meaning unless it appears that the inventor intended to use the word differently. *Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 951 (Fed.Cir.1993). Unison attempts to demonstrate that the word 'between' as used in the claim does not mean "in the space separating [ ]two points," *American College Dictionary* 117 (1970), by referring to Figures 2 and 8 of the '252 patent. Figure 2 depicts the saturable inductor physically located in the space separating the solid state switch and the igniter plug, and Figure 8 shows the solid state switch, the saturable inductor, and the igniter plug in a similar order. Unison, however, asserts that Figure 8 shows the energy storage device falling outside a location between the solid state switch and the igniter plug, thereby demonstrating that the 'network' may fall in places other than in between the solid state switch and the igniter plug placed in series.

The critical element of Unison's approach is whether the energy storage device is a 'network' within the meaning of the claim. According to the claim, the 'network' not only is interposed between the solid state switch and the igniter plug, but the network, by being in that position, "waveshape[s] the voltage and current in order to efficiently ignite the fuel in the turbine engine." '252 Patent, col. 16 at ln. 24–26. The patent specification refers exclusively to use of the saturable core inductor to produce the desired waveform (and thereby to waveshape), *see, e.g.,* '252 Patent, col. 8 at ln. 28–68; the patent specification nowhere states that the energy storage device performs the waveshaping function or discusses use of the energy storage device for that function.[13] Furthermore, the specification text Unison relies upon for its definition of 'interposed between' discusses location of the saturable core inductor in terms of protecting the solid state switch, *see* '252 Patent, col. 3 at ln. 54–58; *id.,* col. 9 at 59–62, and indicates that the saturable core

inductor, not the energy storage device (the capacitor), is the network referred to in the claim. Additionally, the word 'network' appears in the specification just four times; none of these locations refers to a network in the context of the discharge circuit or waveshaping. *See* '252 Patent, col. 11 at ln. 32 (voltage divider network); *id.,* col. 12 at ln. 15 (same); *id.,* col. 12 at ln. 51 (timing network); *id.,* col. 16 at ln. 1 (same). All of this leads to the inescapable conclusion that the network described in the claim is not the energy storage device. With this understanding of the 'network' required by the claim, Unison's argument fails.

Finally, what Unison proposes belies the plain language of the claim. Unison's position would render the phrase 'interposed between' superfluous and read an express claim limitation out of the patent. If a positional reference was not intended by the phrase 'interposed between,' the portion of the claim at issue here could simply read "a network connected in series with the solid state switch and the igniter plug and, thereby, waveshape the voltage and current in order to efficiently ignite the fuel in the turbine engine." The patentee chose not to describe the invention in that manner. Therefore, the Court rejects Unison's proposed definition of 'interposed between' and holds as a matter of law that the 'network' must be placed in the space separating the solid state switch and the igniter plug, as well as in series with the solid state switch and the igniter plug.

F. *'252 Patent Claim 1*—"waveshape the voltage and current in order to efficiently ignite the fuel in the turbine engine"

 As it did with the meaning of 'unipolar,' Lucas contends that the phrase 'waveshape the voltage and current' means to produce a waveform similar to those depicted in Figures 3b and 4 (curve A) of the '252 patent. D.I. 367 at 8; *id.,* app. A at 6; D.I. 376 at 5. Unison replies that this construction is "overly restrictive" because the waveform depicted in Figure 3b is an idealized waveform and the waveforms of Figure 4 are actual and

---

13. While not probative as a matter of law, even the inventor of the '252 patent, John Frus, stated repeatedly at trial that the key contribution of the invention was use of the saturable core inductor to waveshape.

theoretical waveforms "based on 'an output inductor ... across a spark gap in an ignition system.'" D.I. 368 at 13. Arguing that the waveforms in Figures 3b and 4 (curve A) are merely representative of the waveforms produced by devices covered within the scope of the patent, Unison then asserts that the verb 'waveshape' is defined throughout the specification in terms of "a current waveform ... which initially rises relatively slowly, followed by a transition to a fast rising current which quickly peaks and thereafter slowly dissipates." *Id.* at 14 (citing '252 Patent Abstract).

The Court holds that Unison's proposed construction of 'waveshape' is correct as a matter of law. The '252 patent specification demonstrates what the patentee meant by 'waveshape.' Beginning in the abstract, the specification throughout describes the ideal igniter plug waveform as a low di/dt[14] rise followed by a high di/dt rise. *See, e.g.,* '252 Patent, col. 3 at ln. 38–50; *id.,* col. 4 at ln. 1–33; *id.,* col. 4 at ln. 59—col. 5 at ln. 6; col. 7 at ln 23–62. The titles of Figures 3b and 4 refer to waveforms, thus indicating that they are merely indicative of the waveshape required by the patent. Furthermore, the actual waveform produced by the network will depend on the physical and electrical characteristics of the network, as well as the discharge duration and energy dissipation. *See also* '252 Patent, col. 4 at ln. 25–33 (discussing how the waveform characteristics will vary with inductor design). Of course, this does not relieve the network of the requirement to waveshape as detailed by the specification. Therefore, because the waveform may vary with the specific implementation of the network, the Court holds as a matter of law that the disputed claim language requires the network to produce "a current

waveform ... which initially rises relatively slowly, followed by a transition to a fast rising current which quickly peaks and thereafter slowly dissipates."

G. *'437 Patent Claim 21*—"[a]n ignition system having the ability to diagnose the state of health of an igniter plug"

*'154 Patent Claim 1*—"a diagnostic circuit responsive to the exciter and igniter plug detectors for reporting a failure of the igniter plug only when ... the sparks are not being produced at the igniter plug, the diagnostic circuit including an output for reporting the state of the health of the ignition system"[15]

 Lucas contends that the plain meaning of the phrase 'to diagnose the state of health' means to "detect all failures of the plug" with respect to the '437 patent, D.I. 367 at 8; *id.,* app. A at 8; D.I. 376 at 9, and to "detect[ ] all failures of the system, including the failure to produce sparks" with respect to the '154 patent, D.I. 367 at 9; *see also id.,* app. A at 8–9; D.I. 376 at 10. Unison rejoins that 'to diagnose the state of health' requires reference to the table entitled "State of Health" appearing in both patent specifications, as well as the circuits shown and described in the patent. Based on the specification, Unison contends that 'to diagnose the state of health' means "to detect an open circuit condition which is the normal failure mode of the igniter plug." D.I. 368 at 15, 17.[16]

The Court holds as a matter of law that 'to diagnose the state of health' means to detect the normal failure of the igniter plug. First, the phrase 'to diagnose the state of health' is ambiguous and therefore requires reference

---

**14.** The term "di/dt" is a term of art that means rate of current change.

**15.** Claim 21 of the '437 patent and claim 1 of the '154 patent share the same patent specification, and both parties appear to agree that the phrase 'state of health' has the same meaning in both patents. For this reason, and because the claim construction question in both patents arises with regard to the issue of detecting a short circuit of the igniter plug, the Court will discuss the claim language for these two patents jointly.

**16.** An open circuit is a circuit in which current cannot flow. For example, a cut wire is equivalent to an open circuit. In this case, an open circuit occurs when current cannot flow across the plug. In contrast, a short circuit occurs when the current flows around, but not through, a device. At trial, Lucas demonstrated a short circuit by placing a wire across the spark gap of the igniter plug. The current flowed through the wire, rather than across the spark gap, thus creating the short circuit.

to the patentee's dictionary of terms, the specification. Reference to the specification reveals that 'state of health' refers only to detection of the open circuit condition. *See, e.g.*, '437 Patent, col. 3 at ln. 42–44 ("[i]f the igniter plug fails to spark, the input to the output circuit appears as a virtual open circuit"); '154 Patent, col. 3 at 44–46 (same); '437 Patent, col. 5 at ln. 66—col. 6 at ln. 15 ("When the igniter plug 1 fails, it typically fails such that the output circuit 19 appears as an open circuit with respect to the exciter 13.... If the igniter plug 1 fails to fire ..., then the impedance of output circuit 19 remains very large, approaching an open circuit, and the discharge of the exciter 13 must seek an alternative path that is provided by the safety resistor."); '154 Patent, col. 6 at ln. 1–18 (same). Furthermore, the revealed embodiments detect igniter health by comparing the rate of discharge through a healthy igniter plug with the rate of discharge in an open circuit. As described in the specification, detection of whether a spark occurs at the plug is performed indirectly by measuring the rate of discharge across the plug against the rate of discharge that would occur if an open circuit condition existed.

Extrinsic evidence adduced at trial also demonstrates that the typical failure mode of the plug is an open circuit. Trial testimony from all parties indicated that the short circuit failure mode occurs approximately once per one million plug failures. The Court refers to this extrinsic evidence only as an aid to determine what the correct conclusion as to the meaning of the typical failure mode is, and, with this additional understanding, the Court concludes that the typical igniter failure mode is an open circuit.

Finally, accepting the Lucas claim construction would render both patents invalid for failure to disclose the invention adequately. *North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir.1993) (citing 35 U.S.C. § 112), *cert. denied*, —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994). If the claims were required to detect both short and open circuit failures of the plug, both patent claims would be invalid because the patents do not disclose

an embodiment which could detect a short circuit failure. As a result, the Court holds as a matter of law that the phrase to 'state of health' means only that the system must detect an open circuit failure at the plug.

**H. '154 Patent Claim 1**—"an igniter plug detector for detecting whether the high energy pulses produce sparks at the igniter plug"

 Lucas contends this claim requires the detector to "detect all failures to produce sparks," or, stated in the converse, the detector must detect "whether sparks are produced." D.I. 367 at 9, app. at 9; *see also* D.I. 367 at 10. In contrast, Unison contends that this claim language must be construed with reference to the specification. According to Unison, the claim language requires only that the detector "detect whether there is an open circuit condition at the plug." D.I. 368 at 17. This claim language differs from the diagnostic claims discussed above in that it requires the detector to detect whether sparks are being produced at the plug, as opposed to the arguably more general requirement of diagnosing "the state of health."

The Court agrees that the plain language of the claim is unequivocal and that the detector must detect whether sparks are being produced at the plug. This does not mean, however, that the converse is true and that as a matter of law the detector must detect every situation when a spark is not produced at the plug. Furthermore, in the context of the specification, both the preferred and illustrative embodiments operate to detect whether a plasma forms at the plug, which allows a high discharge current to flow through the plug. The failure mode when such a plasma does not form is the open circuit failure mode condition. In sum, as with the 'state of health' discussed previously, *see supra* text at 340–41, nothing in the claims or the specification convinces the Court that the detector must detect all plug failures.

## III. CONCLUSIONS OF LAW

The Court acknowledges that its claim construction as a matter of law differs from that of the jury with respect to three of the eight

342

portions of disputed claim language. In each instance, however, the claim construction selected by the jury falls within the scope of the Court's claim construction as a matter of law. As such, the Court's claim construction does not disturb the findings of the jury as to either infringement or invalidity.

For the reasons discussed above, the Court finds that disputed portions of the patents at suit have the following meanings as a matter of law:

A. '073 Patent Claim 1—"a voltage converter for receiving a low voltage from a system source and converting it to a high DC output voltage" means that the voltage converter produces a DC output voltage of some value relatively greater than the converter input.

B. '073 Patent Claim 1—"a unidirectional device ... for ensuring a unipolar current across the gap of the plug" incorporates the structural limitations of the unidirectional device used to ensure a unipolar current, and therefore, as used in this claim, 'unipolar' does not have its literal meaning of "oriented in a single direction."

C. '073 Patent Claim 1—"solid state means ... such that the following sequence of event [sic] occurs" requires only that the solid state means create the sequence of events described in the claim.

D. '073 Patent Claim 17—"said inductive device" means any inductive device incorporating a sensor "providing a diagnostic signal having electrical characteristics that represent the electrical and magnetic events occurring at the gap of the ignitor plug during the period of energy transfer to a spark across a gap of the ignitor plug" that is placed in the ignition system in accordance with the requirements of the claim.

E. '252 Patent Claim 1—"a network interposed between the solid state switch and the igniter plug so as to form a series connection with the igniter plug and the solid state switch and, thereby, waveshape the voltage and current in order to efficiently ignite the fuel in the turbine engine" means a network placed in the space separating the solid state switch and the igniter plug, as well as in series with the solid state switch and the igniter plug.

F. '252 Patent Claim 1—"waveshape the voltage and current in order to efficiently ignite the fuel in the turbine engine" means to produce "a current waveform ... which initially rises relatively slowly, followed by a transition to a fast rising current which quickly peaks and thereafter slowly dissipates."

G. '437 Patent Claim 21—"the state of health of an igniter plug" and '154 Patent Claim 1—"the state of the health of the ignition system" mean only that an open circuit igniter plug failure must be detected.

H. '154 Patent Claim 1—"an igniter plug detector for detecting whether the high energy pulses produce sparks at the igniter plug" does not mean that the detector must detect both open and short circuit igniter plug failures.